**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| ZIV HARISH, | : |
| Plaintiff, | : **Civil Action No. 21-11088-EP-AME** |
| v. | : **OPINION and ORDER** |
| EHUD ARBIT, et al., | : |
| Defendants. | : |

**ESPINOSA, U.S.M.J.**

This matter is before the Court on the motion by Plaintiff Ziv Harish ("Plaintiff") to disqualify counsel for Defendants Dr. Ehud Arbit ("Arbit") and Isaac Rubinstein ("Rubinstein") (together, "Defendants"): Marc Cooperman, Brian Apel, Jake Earl, Erik Maurer, Katherine Escanlar, as well as the law firms of Banner & Witcoff, Ltd. and Saiber, LLC (collectively, "Defense Counsel").[1] [D.E. 92]. Defendants oppose the motion. [D.E. 102]. The Court has reviewed and considered the papers submitted in connection with the motion by the respective parties and heard oral argument on the motion. [*See* D.E. 138 and 164]. For the following reasons, and for good cause shown, Plaintiff's motion to disqualify is **GRANTED**.

---

[1] Plaintiff seeks the disqualification of all counsel for Defendants. [*See* D.E. 92-1 at 5]. Throughout this Opinion and Order, the term "Defense Counsel" will refer to all counsel for Defendants or any single defense lawyer, unless more specificity is required by the circumstances.

## I.    RELEVANT BACKGROUND

A.  Factual Background[2]

Plaintiff alleges he was the sole inventor of the subject matter claimed in U.S. Patent No. RE46,823 (the "'823 Patent"). [D.E. 19 at 18, ¶ 113]. In this declaratory judgment action, Plaintiff seeks to quiet title to the '823 Patent and to be determined the sole inventor of the subject of the '823 Patent, which currently names Plaintiff and Defendants as inventors. [3] [*See id.* at 18; D.E. 19-1 at 2]. Defendants assert counterclaims against Plaintiff and pro se Defendant Russel Weinzimmer ("Weinzimmer") for fraud, conversion, trespass to chattels, and civil conspiracy. [*See* D.E. 41 at 45-51]. Defendants also assert crossclaims against Weinzimmer for malpractice, negligence, and breach of his fiduciary duty in connection with his work as the patent attorney who prosecuted the '823 Patent. [*See id.* at 51-58].

In June 2020, Defendants executed a Patent Assignment and Purchase Agreement (the "Assignment Agreement"), wherein Defendants sold and assigned their rights in the '823 Patent to a third party, Lincoln Diagnostics, Inc. ("Lincoln"). [*See* D.E. 92-2]. The Assignment Agreement contains a "Representations and Warranties" section, which recites the ways in which each Defendant contributed to the invention in the '823 Patent. [*Id.* at 4]. For example, this section provides that "Arbit conceived of the use of the pain gate theory in conjunction with allergy skin test devices and conceived of the physical proximity between the numbing dull pressure head and the sharp element required for the allergy skin test device." [*Id.*]. It also provides that "Rubinstein conceived of the actual design of the claimed allergy skin test device

---

[2] This factual summary, drawn from the parties' motion papers, provides context and background for this Opinion. While the Opinion is based on the record presented by the parties, nothing herein shall constitute a conclusive finding of fact or a definitive assessment of the weight of the evidence.

[3] The '823 Patent is a broadening reissue of U.S. Patent No. 8,597,199 (the "'199 Patent"), which also names Plaintiff and Defendants as inventors. [*See* D.E. 19 at 8].

to ensure the proper timing and distance between the numbing dull pressure heads and the sharp elements for introducing allergens to the skin." [*Id.*]. Defendants represented and warranted to Lincoln in this section that they "own[] all rights and title to an undivided interest to the entirety of the Patent Rights," and that "[t]here are no existing contracts, agreements, options, commitments, or rights with, to, or in any person or entity to acquire or license any of the Patent Rights." [*Id.*].

The Assignment Agreement also contains a section titled "Cooperation." [D.E. 92-2 at 5]. In this section, Defendants agreed to

> execute all such papers as may be necessary to perfect Lincoln's title to the Patent Rights, to communicate all known facts respecting the inventions, improvements, and discoveries therein, to testify as parties in any legal or administrative proceedings in person and by declaration, to be named as parties and be represented by Lincoln in any such proceedings, to sign all lawful papers, to assist Lincoln in establishing their inventive contributions, *and generally to do all things necessary to aid Lincoln to obtain and enforce for its own benefit, ownership of and patent protection for, the inventions, improvements, and discoveries of the Patent Filings, all at the expense of Lincoln.*

[*Id.*] (emphasis supplied).

Additionally, the Assignment Agreement contains an "Indemnification" section, which provides that "Lincoln agrees to indemnify Assignors against disputes concerning the ownership of the Patent Rights filed by either Ziv Harish or Russ Weinzimmer." [D.E. 92-2 at 5]. The indemnity lasts until the expiration of the patent rights, and this section specifies that "[t]he liability under this indemnity shall in no case exceed $250,000." [*Id.*]. Under a section titled "Payment and Refund," the Assignment Agreement further provides that "[t]he entire Patent Purchase Payment paid by Lincoln to [Defendants] shall be immediately and fully refunded by

[Defendants] if any of the [Defendants'] undertakings, obligations, representations, and warranties under this Agreement are breached." [*Id.* at 3].

It appears Plaintiff became aware of the Assignment Agreement in December 2020, *see* D.E. 102-5, and filed this action on May 11, 2021. [D.E. 1]. Not long thereafter, on May 25, 2021, Defendants and Lincoln entered into a Common Interest and Litigation Cooperation Agreement and a Consent to and Waiver of Conflicts of Interest Agreement with the law firm, Banner & Witcoff, Ltd. ("Banner Witcoff"), so that Banner Witcoff could represent Defendants in this lawsuit. [D.E. 102 at 8; D.E. 102-16, Declaration of Dr. Ehud Arbit ("Arbit Dec.") ¶¶3-4; D.E. 102-15, Declaration of Isaac Rubinstein ("Rubenstein Dec.") ¶¶3-4].

An attorney at the law firm Saiber LLC ("Saiber") entered her appearance as counsel for Defendants in August 2021, *see* D.E. 5, and in September 2021, the Court granted Defendants' application to admit *pro hac vice* Marc S. Cooperman, Erik Maurer, and Brian Apel at Banner Witcoff as attorneys for Defendants. [D.E. 9]. Plaintiff did not object to the *pro hac vice* admission of those Banner Witcoff attorneys. [D.E. 7]. On September 24, 2021, Defendants and Lincoln executed a Consent to and Waiver of Conflicts of Interest with Saiber. [*See* D.E. 102 at 8-9; D.E. 102-16, Arbit Dec. ¶5; D.E. 102-15, Rubenstein Dec. ¶5]. On October 4, 2021, Plaintiff filed a third-party litigation funding disclosure statement pursuant to Local Civil Rule 7.1.1., which stated that no person or entity was providing him with funding for this action. [D.E. 16]. Neither Defendants nor Weinzimmer filed such disclosures.

On November 14, 2022, Plaintiff, through counsel, delivered to Defendants, through counsel, proposed settlement terms, under which Defendants would agree that Plaintiff is the sole inventor of the reissued '823 Patent and would acknowledge that Defendants' sale and assignment of rights in the '823 Patent to Lincoln was invalid "since they had no rights to

convey." [*See* D.E. 92-4]. On January 30, 2023, Defendants delivered a counteroffer, which, among other terms, stated that Defendants would agree that Plaintiff is the sole inventor of the Patent, but the assignment to Lincoln would stay in place. [D.E. 92-5]. That counteroffer also proposed that Plaintiff would grant Lincoln a covenant not to sue under the reissued '823 Patent, the '199 Patent, or any related patents; would agree not to practice the reissued '823 Patent, the '199 Patent, or any related patents; and would not grant any other party besides Lincoln rights under these patents. [*Id.*]. The parties did not reach a settlement.[4]

On October 31, 2023, the Court held a status conference at which Plaintiff raised the question of whether Defendants were required to file a third-party litigation funding disclosure statement pursuant to Local Rule 7.1.1. [*See* D.E. 102-8 at 62:14-23]. During that discussion, Defense Counsel stated their view that: "Dr. Arbit and Mr. Rubinsetin and Lincoln, all three of them, have obligations to pay for this litigation," but "disclosure under the rule is not necessary." [D.E. 102-8 at 63:24-25, 64:1, 5-6].

On January 11, 2024, the parties participated in an unsuccessful settlement conference. [*See* D.E. 77]. Before that conference, Defense Counsel expressed in a January 1, 2024 email to Plaintiff's counsel that "Lincoln, Dr. Arbit and Mr. Rubinstein are willing to participate in this settlement discussion solely in an effort to compromise." [D.E. 92-6 at 2]. That email further communicated that "Dr. Arbit, Mr. Rubinstein and Lincoln are not willing to settle anywhere in the vicinity of the range you have proposed," and that "[u]nless and until Dr. Harish makes a

---

[4] The parties' papers outline some of the extensive history of dealings between the parties and Lincoln, preceding and related to the '823 Patent and this action. [*See, e.g.*, D.E. 19 at 7, ¶ 46]. In broad summary, Plaintiff asserts Lincoln eventually developed and patented a product that Plaintiff believes infringes upon the '823 Patent. [*See, e.g.*, D.E. 92-1 at 8, n. 5; D.E. 139-4 at 2]. In this action, Plaintiff seeks to correct inventorship and consolidate ownership of the '823 Patent to later bring a patent infringement claim against Lincoln. [*See, e.g.*, D.E. 19 at 18; D.E. 139-1 at 6-7]. Lincoln's acquisition of Defendants' ownership rights to the '823 Patent makes such a claim impossible, and the specter of such a costly action clearly motivates Lincoln in its third-party funding of the Defendants' litigation costs in this action.

rational demand . . . Dr. Arbit's, Mr. Rubinstein's and Lincoln's settlement offer will not change . . ." [*Id.* at at 3].[5]

During a March 27, 2024 conference, the Court considered Plaintiff's application for leave to file a motion to disqualify Defense Counsel due to the conflicts of interest potentially posed by their representation of both Defendants and Lincoln, as well as Lincoln's contribution to Defense Counsel's attorneys' fees, under New Jersey Rules of Professional Conduct 1.7 ("N.J.R.P.C. 1.7") and 1.8 ("N.J.R.P.C. 1.8"). [*See* D.E. 89; D.E. 91 at 44]. During that conference, Defense Counsel asserted that they "represent[ed] the two parties-in-suit as well as Lincoln, and [they] are advising all of them and representing all of them to the extent they have interests specifically in this case." [D.E. 91 at 70:4-7]. On April 11, 2024, the Court granted Plaintiff's application for leave to file a motion to disqualify Defense Counsel. [D.E. 89].

B.  The Parties' Arguments

Plaintiff argues that Defense Counsel's representation of both Defendants and Lincoln poses an unwaivable conflict of interest. [D.E. 92-1 at 13]. Plaintiff maintains that, for Lincoln to pay or contribute to Defense Counsel's attorneys' fees under N.J.R.P.C. 1.8(f), as informed by N.J.R.P.C. 1.7 and N.J.R.P.C. 5.4(c), Defense Counsel must satisfy the six conditions established by the New Jersey Supreme Court in *In re State Grand Jury Investigation*, 200 N.J. 481 (2009) (hereinafter, "*Grand Jury*"). [*Id.* at 21]. Plaintiff asserts that because Defense Counsel cannot satisfy those *Grand Jury* conditions, they must be disqualified.

---

[5] Although obvious from the case caption and the foregoing recitation of facts, it bears noting here that Lincoln is *not* a party to this action. That Lincoln appeared at a settlement conference in this matter, represented by Banner Witcoff, and made demands concerning the framework and details of a potential settlement, informs, in important part, this Court's assessment of the facts and controlling law concerning the existence of a conflict and the viability of Plaintiff's motion to disqualify.

Specifically, Plaintiff argues that Defense Counsel cannot simultaneously be engaged in attorney-client relationships with both Defendants and Lincoln and that there is no evidence Defendants signed a valid waiver of the conflict of interest. Plaintiff also argues that the parties' communications in November 2022, January 2023, and January 2024, demonstrate that Lincoln, as a third-party payer, has directed, regulated, and interfered with Defense Counsel's representation of Defendants in violation of N.J.R.P.C. 1.8(f), 5.4(c), and *Grand Jury*. According to Plaintiff, Lincoln's improper interference is supported by the requirement in the Assignment Agreement that Defendants "generally [] do all things necessary to aid Lincoln to obtain and enforce" ownership of the '823 Patent.

Finally, Plaintiff further argues that Defense Counsel has violated *Grand Jury* by communicating the substance of this suit to Lincoln, and that the fee arrangement specified in the Assignment Agreement allows Lincoln to stop payment after Defendants' attorneys' fees reach $250,000, contrary to the requirement in *Grand Jury* that a third-party funder's payment of legal expenses does not end without leave of Court.

In opposition, Defendants maintain that *Grand Jury* does not apply to this case. [D.E. 102 at 25]. Defendants argue that Defense Counsel's simultaneous representation of both Defendants and Lincoln does not pose any conflict of interest because Defendants and Lincoln are all united in their opposition to Plaintiff's claims. [*Id.* at 18]. Defendants assert that, even if there were a conflict of interest, Defendants validly consented to the arrangement and waived any such conflict. [*Id.* at 21].

Defendants also argue that Defense Counsel's representation does not violate N.J.R.P.C. 1.8, 5.4, or *Grand Jury*, because these rules do not bar attorneys from jointly representing clients who have agreed to share litigation costs for joint counsel. [D.E. 102 at 22]. Finally, according to

Defendants, Plaintiff's position would lead to absurd results, because it would prohibit joint representation and would prevent co-clients from ever sharing litigation costs. [*Id.* at 29].

## II.    DISCUSSION

"The district court's power to disqualify an attorney derives from its inherent authority to supervise the professional conduct of attorneys appearing before it." *United States v. Miller,* 624 F.2d 1198, 1201 (3d Cir.1980). "As a general rule, the exercise of this authority is committed to the sound discretion of the district court." *Id.* When presented with a motion to disqualify an attorney, a court must balance the deference owed to a party's choice of counsel against the need to maintain high professional standards. *Dantinne v. Brown*, No. 17-0486, 2017 WL 2766167, at *2 (D.N.J. June 23, 2017) (citing *City of Atl. City v. Trupos*, 201 N.J. 447, 462 (2010)); *see also United States v. Bos. Sci. Neuromodulation Corp.*, No. 11-1210, 2013 WL 2404816, at *4 (D.N.J. 2013) ("Permitting a litigant to retain his or her choice of counsel is a countervailing policy to be considered against disqualification."); *Int'l Bus. Machs. Corp. v. Levin*, 579 F. 2d 271, 283 (3d Cir. 1978) ("The maintenance of public confidence in the propriety of the conduct of those associated with the administration of justice is so important a consideration that we have held that a court may disqualify an attorney for failing to avoid even the appearance of impropriety.").

"Disqualification questions are intensely fact-specific, and it is essential to approach such problems with a keen sense of practicality as well as a precise picture of the underlying facts." *Carlyle Towers Condo. Ass'n, Inc. v. Crossland Sav., FSB,* 944 F. Supp. 341, 345 (D.N.J. 1996) (quoting *Gould, Inc. v. Mitsui Mining & Smelting Co.,* 738 F. Supp. 1121, 1124 (N.D. Ohio 1990)). The motion must be supported by facts that must be closely scrutinized "to prevent unjust results." *Carlyle Towers*, 944 F. Supp. at 345; *see also Carreno v. City of Newark*, 834 F. Supp. 2d 217, 224 (D.N.J. 2011). Indeed, "surmise alone cannot support an order of

disqualification." *Carreno*, 834 F. Supp. 2d at 224 (quoting *City of Atlantic City v. Trupos*, 201 N.J. 447, 469 (2010)). In view of the foregoing considerations, courts in this District have consistently held that the movant "must carry a heavy burden and meet a high standard of proof before a lawyer is disqualified." *See Carlyle Towers,* 944 F. Supp. at 345 (quoting *Alexander v. Primerica Holdings, Inc.*, 822 F. Supp. 1099, 1114 (D.N.J. 1993)).

A.  Plaintiff Has Standing to Bring a Motion to Disqualify

First, Defendants argue that Plaintiff lacks standing to seek disqualification because Plaintiff is "neither a current or former client of [Defense Counsel]." [D.E. 102 at 14]. They argue that Plaintiff's motion is a tactical attempt to remove Defense Counsel "because he is unhappy with how his case has developed." [*Id.* at 15]. Generally, "a party does not have standing to bring a motion to disqualify based on a material conflict of interest unless the party is either a former or current client." *Shire Laboratories, Inc. v. Nostrum Pharms.*, No. 03-4436, 2006 WL 2129482, at *4 (D.N.J. July 26, 2006). This is due to "concerns about the tactical use of disqualification motions to harass opposing counsel." *In re Congoleum Corp.*, 426 F.3d 675, 686 (3d Cir. 2005).

While Plaintiff here is an adversary and not a current or former client of Defense Counsel, this does not bar Plaintiff from establishing standing to raise a conflict of interest that violates the New Jersey Rules of Professional Conduct. Indeed, the Third Circuit has not foreclosed the possibility that adversaries possess standing to raise a conflict of interest. *See High 5 Games, LLC v. Marks,* No. 13-7161, 2018 WL 2278103, at *5 (D.N.J. May 18, 2018) ("The Third Circuit has not decided whether a party has standing to raise a supposed conflict between two adversary parties"). And this District has held that "[a]dversaries, as well as former clients, may raise conflict of interest concerns." *See Infosphere Consulting, Inc. v. Habibi Life,*

*LLC*, No. 19-15577, 2020 WL 4559138, at *3 (D.N.J. Aug. 7, 2020); *Cafaro v. HMC Int'l, LLC*, No. 07-2793, 2012 WL 4857763, at *6 n.8 (D.N.J. Oct. 11, 2012) (citing *Schiffli Embroidery Workers Pension Fund v. Ryan. Beck and Co.,* No. 91–5433, 1994 WL 62124, *1, *2 (D.N.J. Feb. 23, 1994)); *see also Essex Cnty. Jail Annex Inmates v. Treffinger*, 18 F. Supp. 2d 418, 431 (D.N.J. 1998); *Dantinne*, 2017 WL 2766167, at *1 n.1.

Moreover, the Court has an obligation to protect the professional integrity and ethics of the attorneys who practice before it. *See In re Corn Derivatives Antitrust Litig.,* 748 F. 2d 157, 160 (3d Cir. 1984) ("[O]ne of the inherent powers of any federal court is the admission and discipline of attorneys practicing before it."). Similarly, attorneys have an obligation under the Rules of Professional Conduct to bring to the attention of an appropriate authority conduct "that raises a substantial question as to a lawyer's honesty, trustworthiness, or fitness as a lawyer." *Congoleum Corp.*, 426 F.3d at 686; *see also* N.J.R.P.C. 8.3. Conflicts of interest raised by adversaries may also be especially appropriate in situations where it is unlikely that any of the parties other than the adversaries would raise the issue. *See Congoleum Corp.*, 426 F.3d at 687. Because adversaries do not lack standing to bring motions to disqualify, and because Defense Counsel's concurrent representation of Defendants and of non-party Lincoln raises concerns about professional integrity and ethics, the Court rejects Defendants' standing argument and reaches the merits of Plaintiff's motion.

    B.  <u>This Court Will Apply the New Jersey Rules of Professional Conduct and *Grand Jury*</u>

Plaintiff's motion to disqualify is primarily concerned with the conflict of interest issues posed by Lincoln's payment of Defense Counsel's fees as a third party funder and seeks to disqualify Defense Counsel under N.J.R.P.C. 1.8(f). In *Grand Jury*, the New Jersey Supreme

Court analyzed N.J.R.P.C. 1.8(f) in the context of its interaction with N.J.R.P.C. 1.7 and 5.4(c) to produce a six-part test to determine whether disqualification is merited. 200 N.J. at 494.

New Jersey Rule of Professional Conduct 1.7 prohibits representations that involve a concurrent conflict of interest. A concurrent conflict of interest exists if:

> (1) the representation of one client will be directly adverse to another client; or
> (2) *there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client*, a former client, or a third person or by a personal interest of the lawyer.

N.J.R.P.C. 1.7(a) (emphasis supplied).

This notwithstanding,

> [A] lawyer may represent a client if:
> (1) each affected client gives informed consent, confirmed in writing, after full disclosure and consultation, provided, however, that a public entity cannot consent to any such representation. When the lawyer represents multiple clients in a single matter, the consultation shall include an explanation of the common representation and the advantages and risks involved;
> (2) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;
> (3) the representation is not prohibited by law; and
> (4) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal.

N.J.R.P.C. 1.7(b).

In addition to this, New Jersey Rule of Professional Conduct 1.8(f) governs conflicts of interest that may arise when attorneys' fees are paid by a third party payer, providing that:

> A lawyer shall not accept compensation for representing a client from one other than the client unless:
> (1) the client gives informed consent;
> (2) *there is no interference with the lawyer's independence of professional judgment or with the lawyer-client relationship*; and

>   (3) information relating to representation of a client is protected as
>   required by RPC 1.6.

N.J.R.P.C. 1.8(f) (emphasis supplied).

New Jersey Rule of Professional Conduct 5.4 addresses conflicts of interest as they concern the professional independence of a lawyer and provides that "[a] lawyer shall not permit a person who recommends, employs, or pays the lawyer to render legal services for another to direct or regulate the lawyer's professional judgment in rendering such legal services." N.J.R.P.C. 5.4(c).

*Grand Jury* involved an employer whose employees were called to testify in front of a New Jersey state grand jury. 200 N.J. at 485. In response, the employer provided those employees with counsel for the purposes of the grand jury inquiry and paid their attorneys' fees. *Id*. at 486. The state challenged that arrangement, and the New Jersey Supreme Court examined "whether, and under what circumstances, a lawyer may represent a client when the fees and costs incurred are being paid by another" under N.J.R.P.C. 1.8(f), N.J.R.P.C. 1.7, and N.J.R.P.C. 5.4(c). *Id.* at 494.

While N.J.R.P.C. 1.8(f) "makes clear that three factors must coalesce in order to allow a lawyer paid by a third party to represent a client," the New Jersey Supreme Court explained that "the considerations that animate *RPC* 1.7(a)(2)—that there be no concurrent conflict of interest—and *RPC* 5.4(c)—that no third party may influence the lawyer's professional judgment—also are relevant and must be addressed." *Grand Jury*, 200 N.J. at 495. Therefore, that Court held, "[a] synthesis of RPCs 1.7(a)(2), 1.8(f) and 5.4(c) yields a salutary, yet practical principle: a lawyer may represent a client but accept payment, directly or indirectly, from a third party provided each of [] six conditions is satisfied." *Id.*

First, informed consent of the client must be secured. *Grand Jury*, 200 N.J. at 495. Second, "[t]he third-party payer is prohibited from, in any way, directing, regulating or interfering with the lawyer's professional judgment in representing his client." *Id.* Third, "[t]here cannot be any current attorney-client relationship between the lawyer and the third-party payer." *Id.* at 496. Fourth, "[t]he lawyer is prohibited from communicating with the third-party payer concerning the substance of the representation of his client." *Id.* Fifth, "[t]he third-party payer shall process and pay all such invoices within the regular course of its business, consistent with manner, speed and frequency it pays its own counsel." *Id.* Finally, sixth, "[o]nce a third-party payer commits to pay for the representation of another, the third-party payer shall not be relieved of its continuing obligations to pay without leave of court brought on prior written notice to the lawyer and the client." *Id.*

Addressing Plaintiff's reliance on *Grand Jury*, Defendants argue that, as a threshold matter, this Court should reject the applicability of *Grand Jury* because the Court "is not bound by the decisions of the New Jersey Supreme Court." [D.E. 102 at 25]. Defendants emphasize that Plaintiff "cite[d] no case from this Court applying *Grand Jury* to a disqualification motion." [*Id.*].

However, Local Civil Rule 103.1 governs judicial ethics and professional responsibility and provides that "[t]he Rules of Professional Conduct of the American Bar Association as revised by the New Jersey Supreme Court shall govern the conduct of the members of the bar admitted to practice in this Court." L. Civ. R. 103.1(a). Accordingly, "to resolve questions of professional ethics, this Court turns to New Jersey's Rules of Professional Conduct." *Carlyle Towers,* 944 F. Supp. at 344. And while the Local Rules "do not require that this Court be bound" by the decisions of the New Jersey Supreme Court, "this Court may certainly look for

guidance to the decisions of the New Jersey state courts." *Id.* at 345. In fact, "[s]tate precedents as to professional responsibility should be consulted when they are compatible with federal law and policy and do not 'balkanize federal law.'" *Congoleum Corp.*, 426 F.3d at 687 (citing *Grievance Comm. for Southern District of New York v. Simels,* 48 F.3d 640, 645 (2d Cir.1995)). Additionally, this Court has previously relied on *Grand Jury* in its analysis of attorneys' professional responsibilities, and the Third Circuit has affirmed that reliance. *See MaxLite, Inc. v. ATG Electronics, Inc.*, No. 23-1719, 2024 WL 1526749, at *4 (3d Cir. Apr. 9, 2024) (affirming the District Court's application of *Grand Jury* to hold that a company was not liable as a third-party payer of employees' legal fees, because the joint representation agreement between the parties imposing such obligation was invalid for violating the factors enumerated in *Grand Jury*). Accordingly, this Court concludes that Defendants' arguments concerning the applicability of *Grand Jury* to this motion to disqualify counsel lack merit.

Defendants further argue that "the plain language of *Grand Jury* makes clear that it applies only when evaluating whether a lawyer may accept payment from a non-client" and "does not apply when a lawyer jointly represents multiple clients with a common interest." [D.E. 102 at 26]. However, the plain language of *Grand Jury* makes clear that its aim was to establish guardrails that must be present "to allow a lawyer paid by a third party to represent a client." 200 N.J. at 495. In doing so, the New Jersey Supreme Court did not distinguish between "non-client" third-party payers and "client" third-party payers with a common interest, nor did it restrict its application to "non-client" third-party payers. *See also MaxLite, Inc.*, 2024 WL 1526749, at *4 (affirming and explaining that, under *Grand Jury*, the joint representation agreement between the employer and the employees was invalid because three of the six conditions were not met).

14

Here, Lincoln and Defendants executed the Assignment Agreement, wherein Lincoln "agree[d] to indemnify [Defendants] against disputes concerning the ownership of the Patent Rights filed by either Ziv Harish or Russ Weinzimmer." [D.E. 92-2 at 5]. Defense Counsel confirmed that Lincoln had "obligations to pay for this litigation" at the October 31, 2023 conference. [D.E. 102-8 at 63:24-25, 64:1]. As such, Defense Counsel is a "lawyer paid by a third party" within the meaning of *Grand Jury* and under 1.8(f),[6] and Plaintiff's motion is therefore governed by *Grand Jury*. *See Grand Jury*, 200 N.J. at 494-95.

    C.   <u>Defense Counsel's Representation of Defendants and Lincoln Creates a Conflict of Interest</u>

Defendants next argue that Defense Counsel's representation of both Defendants and Lincoln poses no actual conflict of interest that would interfere with their duty of undivided loyalty to their clients. When determining whether a conflict of interest exists, "[t]he presence of the appearance of impropriety standing alone is not a sufficient ground for disqualification." *Congoleum Corp.*, 426 F.3d at 692. Conflicts of interest that are merely speculative are

---

[6] On April 29, 2024, Plaintiff requested leave to file a motion for relief under Local Civil Rule 7.1.1. [D.E. 99]. Rule 7.1.1(a) requires all parties to

        file a statement . . . containing . . . information regarding any person or entity that is not a party and is providing funding for some or all of the attorneys' fees and expenses for the litigation on a non-recourse basis in exchange for (1) a contingent financial interest based on the results of the litigation or (2) a non-monetary result that is not in the nature of a personal or bank loan, or insurance.

Defendants had not filed a statement that disclosed the requisite information regarding Lincoln's funding for Defendants' attorneys' fees pursuant to Rule 7.1.1(a). Because Rule 7.1.1(c) provides that "[n]othing herein precludes the Court from ordering such other relief as may be appropriate," Plaintiff sought leave to pursue sanctions and to file a motion seeking an order that would require "Defendants to enter a statement identifying Lincoln as the entity funding the litigation." [D.E. 99 at 4]. Defendants filed a letter in opposition on May 10, 2024, asserting that Lincoln's indemnification of Defendants did not create any disclosure obligation under Rule 7.1.1. [D.E. 105].

    On August 1, 2024, the Court issued an Order that construed Plaintiff's application as a formal motion and Defendants' letter as a formal opposition and denied Plaintiff's motion as moot, after Defendants offered to deliver voluntarily documents that reflect the funding relationship between Defendants and Lincoln for *in camera* review. [D.E. 140 at 2]. As discussed in more detail herein, those documents, now part of the record in this matter, help establish that Defense Counsel are lawyers paid by third party Lincoln to represent Defendants under N.J.R.P.C. 1.8(f) and *Grand Jury*.

insufficient to disqualify counsel. *Ruscitto v. Valley Hosp.*, No. 15-5704, 2017 WL 11635419, at *7 (D.N.J. June 1, 2017); *see also DelConte v. Monroe Twp. Bd. of Educ.*, No. 19-13731, 2020 WL 6119859, at *4 (D.N.J. Oct. 16, 2020) (denying motion to disqualify where "[d]efendants' arguments for why a conflict exists are based on conjecture"). Still, this District has held that "disqualification could be imposed where an actual conflict of interest was present or, within the discretion of the court, where a potential conflict of interest existed." *Congoleum Corp.*, 426 F.3d at 692 (citing *In re Marvel Ent. Grp.*, 140 F.3d 463 (3d Cir. 1998)).

Defendants contend that no conflict of interest exists because the interests of Defendants and Lincoln are aligned. [D.E. 102 at 18 ("Defendants and Lincoln are, and always have been, united in their opposition to Dr. Harish's claims.")]. As such, Defendants argue, Plaintiff's conflict of interest claim relies only "on speculative theories that are legally insufficient." [D.E. 102 at 19]. While it is true that a conflict of interest may not exist where the parties' interests are united, *see Infosphere Consulting,* 2020 WL 4559138, at *3; *High 5 Games,* 2018 WL 2278103, at *4 (holding no conflict of interest where all defendants were united in their positions), this Court has disqualified counsel where a potential conflict of interest existed and where interests that seemed united or aligned on their face were in fact in conflict. *See Wilkes v. Passaic Cnty.*, No. 12-6498, 2016 WL 852602, at *2 (D.N.J. Mar. 4, 2016).

The plaintiff in *Wilkes* brought a hostile work environment action against her employer and sought to disqualify her employers' counsel after she learned they also represented a non-party former coworker in the suit. 2016 WL 852602, at *1. The employers' counsel argued against disqualification, asserting that, as a former employee, the former coworkers' interests were aligned with the employer. *Id.* The court examined whether "a substantial identity of interests" existed "to outweigh potential conflicts," and granted the motion to disqualify,

concluding that "[i]n view of the totality of the circumstances, there [were] plain and interwoven conflicts" warranting disqualification, as the potential for the coworker's interests to turn against the employer posed "a significant risk" that employers' counsel would be materially limited in his responsibility to both. *Id.* at *2.

Here, the interests of Defendants and Lincoln are not aligned; nor is the conflict of interest even potential, speculative, or the result of conjecture. Defense Counsel's representation of Defendants is rooted in the Assignment Agreement that Defendants executed with Lincoln, wherein Defendants provided certain warranties and representations that guaranteed they were inventors of the '823 Patent, and Lincoln agreed to indemnify Defendants against disputes about the ownership of the patent rights. [*See* 92-2 at 4-5]. Although on its face, Defendants' and Lincoln's interests appear aligned concerning the ownership of the '823 Patent, provisions of the Assignment Agreement convey the dominance of Lincoln's interests to the subordination of Defendants' interests. For example, Defendants agreed that "[t]he entire Patent Purchase Payment paid by Lincoln to [Defendants] shall be immediately and fully refunded [] if any of any of the [Defendants'] undertakings, obligations, representations, and warranties . . . are breached." [*Id.* at 3]. The "Cooperation" section of the Assignment Agreement requires Defendants "generally to do all things necessary to aid Lincoln to obtain and enforce for its own benefit, ownership of and patent protection for . . . the patent filings, all at the expense of Lincoln." [*Id.* at 5]. Consequently, the full scope of advice and advocacy Defense Counsel may provide to Defendants is necessarily constrained by their predominant focus on and loyalty to Lincoln. Thus, even more than in *Wilkes*, Defense Counsel's representation of both Defendants and Lincoln poses "plain and interwoven conflicts" in view of the totality of the circumstances, which materially limit their responsibility and loyalty to Defendants. 2016 WL 852602, at *2.

Defense Counsel's representation of both Lincoln and Defendants poses a conflict of interest under the New Jersey Rules of Professional Conduct.[7]

D. *Grand Jury* Analysis

Next, the Court applies the six conditions in *Grand Jury* to determine whether Defense Counsel's conflicted representation of Defendants and third-party payor Lincoln merits disqualification under N.J.R.P.C. 1.8(f), 1.7, and 5.4(c).

First, *Grand Jury* held that to accept payment from a third party, an attorney must obtain the client's informed consent. 200 N.J. at 495. Defendants argue they and Lincoln have all given their informed consent to how Defense Counsel is compensated and that this consent complies with both N.J.R.P.C. 1.7 and N.J.R.P.C. 1.8. [D.E. 102 at 21-23]. New Jersey Rule of Professional Conduct 1.0 defines "informed consent" as "the agreement by a person to a

---

[7] Defense Counsel submitted to the Court for *in camera* review a document titled "Common Interest and Litigation Cooperation Agreement" (the "Cooperation Agreement"), which sets forth Banner Witcoff's litigation approach and the respective obligations of Lincoln and Defendants concerning Banner Witcoff's representation of Defendants in this matter. Defense Counsel asserts the Cooperation Agreement is protected by the attorney-client privilege. *See AMEC Civ., LLC v. DMJM Harris, Inc.*, No. 6-64, 2008 WL 8171059, at *4 (D.N.J. July 11, 2008) (explaining that a "joint defense agreement" prepared in anticipation of litigation falls within the attorney work product privilege and is protected absent substantial need to compel its production). Whether the Cooperation Agreement can be accurately characterized as a joint defense agreement is an open question because Lincoln is not a party to this action and thus is not defending this live claim jointly with Defendants. To be sure, Lincoln does not purport to have participated in the invention of the '823 or '199 Patents. Nevertheless, for the purpose of resolving this motion only, the Court assumes the privilege applies. Thus, despite the ethically dubious substance of the Cooperation Agreement, the Court is constrained by the privilege from discussing its specific provisions. However, the Court has conducted a careful and exacting review of the details of the document and finds that explicit provisions in the Cooperation Agreement affirm the Court's conclusion that the dominance of Lincoln's interests necessarily and materially limits the scope of advocacy and loyalty Defense Counsel may provide to Defendants, to the detriment of Defendants.

Defense Counsel also submitted to the Court for *in camera* review three separate agreements titled "Consent to and Waiver of Conflicts of Interest," each executed between Banner Witcoff and Defendant Isaac Rubinstein; Defendant Ehud Arbit; and Lincoln, respectively. These documents further define the relationship between Defense Counsel, Defendants, and Lincoln with respect to this lawsuit. Defense Counsel asserts these consent waivers are privileged and therefore protected from disclosure. [*See* D.E. 102 at 9, n.1]; *see also Ballew v. City of Pasedena*, No. 18-0712, 2020 WL 13584507, at *3 (C.D. Cal. Nov. 12, 2020) (holding that the attorney-client privilege applied to conflict of interest waivers, because they "provide[d] legal advice about, among other things, litigation strategy and potential conflicts of interest that could arise."). Thus, just as with the Cooperation Agreement, the Court is constrained from discussing specific provisions. However, the provisions contained in these agreements make clear that Lincoln's interests take precedence over those of Defendants. Despite their assertions to the contrary, Defense Counsel's representation of both Lincoln and Defendants creates a real, current, and non-speculative conflict of interest.

proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct." N.J.R.P.C. 1.0(e). Courts analyzing informed consent under RPC 1.7 have explained that consents must be "knowing, intelligent, and voluntary." *Celgene Corp. v. KV Pharm. Co.*, No. 07-4819, 2008 WL 2937415, at *4 (D.N.J. July 29, 2008) (citing *In re Dolan,* 76 N.J. 1,13 (1978)). This "requires the attorney to provide meaningful consultation to the client about potential conflicts." *Celgene Corp.*, 2008 WL 2937415, at *5. "The full significance of the representation of conflicting interests should be disclosed to the client so that he may make an intelligent decision before giving his consent." *In re Kamp,* 40 N.J. 588, 596 (1963).

In *Celgene Corp*, the plaintiff was an assignee of patents and sued the defendant for patent infringement. 2008 WL 2937415, at *1. After a law firm that had worked with the plaintiff for years on other matters entered its appearance on behalf of the defendant in the patent infringement matter, the plaintiff moved to disqualify that firm from representing the defendants. *Id.* The Court rejected the law firm's argument that it obtained informed consent to the concurrent representation under N.J.R.P.C. 1.7(b) and N.J.R.P.C. 1.0(e). *Id.* at *8. In doing so, the Court explained that the law firm's waiver provisions were inadequate because they were "so general" that they lacked an explanation of the kinds of cases that may give rise to a conflict of interest; lacked information or explanation about the risks of any conflicts of interest; and lacked any explanation of reasonably available alternatives to the concurrent representation. *Id.*

Here, Defense Counsel asserts that they obtained informed consent in 2021 when Defendants (1) both signed and entered into the Cooperation Agreement with Lincoln; (2) each executed a "Consent to and Waiver of Conflicts of Interest" agreement with Banner Witcoff that contained waiver provisions (the "Banner Witcoff Waivers"); and (3) executed a "Waiver

Agreement" with Saiber (the "Saiber Waiver"). [D.E. 102 at 8-9]. Defense Counsel submitted these documents to the Court for *in camera* review.

In the Court's assessment, the Banner Witcoff Waivers likely communicated information that would adequately allow Defendants to make intelligent and knowledgeable decisions before giving their consent.[8] However, the Saiber Waiver does not meet the requirements for waiver in RPC 1.0(e) and *Celgene Corp*.[9] In the Court's assessment, it is doubtful that Defendants validly waived the conflict of interest inherent in Saiber's representation of both Defendants and Lincoln. Thus, the first condition of *Grand Jury* is not satisfied, because even if Defense Counsel provided sufficient information to demonstrate it obtained informed consent to validly waive the conflict of interest that Banner Witcoff's representation poses, it did not obtain informed consent that validly waived the conflict of interest that Saiber's representation poses.

---

[8] As mentioned previously in footnote 7, *supra*, Defense Counsel asserts these consent waivers are privileged and therefore protected from disclosure. [*See also* D.E. 102 at 9, n.1]. The Court conducted *in camera* review of and carefully scrutinized the Banner Witcoff Waivers and concludes that, unlike the agreements in *Celgene Corp.*, the provisions included in the Banner Witcoff Waivers are not so general that the reader has no clear idea about the conflicts of interest that exist or that may arise. The Banner Witcoff Waivers describe specific ways in which Defendants' and Lincoln's interests do diverge and may further conflict. The Banner Witcoff Waivers also describe consequences of such tensions and reasonably suggest that alternatives to concurrent representation exist.

Notably, however, the Banner Witcoff Waivers contain explicit provisions that make clear Lincoln is directing and controlling this litigation. In addition to this, the Banner Witcoff Waivers refer to the Assignment Agreement, which includes a provision that "if any of [Defendants'] undertakings, obligations, representations, and warranties under this Agreement are breached," then "[t]he entire Patent Purchase Payment paid by Lincoln to [Defendants] shall be immediately and fully refunded by [Defendants]." [*See* D.E. 92-2 at 3]. These provisions in the Banner Witcoff Waivers and in the Assignment Agreement, other provisions of the Assignment Agreement discussed herein, along with certain provisions of the Cooperation Agreement that prioritize Lincoln's interests all call into question the degree to which Defendants' consent to and waiver of conflicts of interest are "knowing, intelligent, and voluntary." Together, they reflect the degree to which Defense Counsel's loyalty to Defendants is subordinate to and materially limited by their loyalty to Lincoln.

[9] Defense Counsel asserts the Saiber Waiver is privileged and therefore protected from disclosure. [*See* D.E. 102 at 9, n.1]. Unlike the Banner Witcoff Waivers, the Saiber Waiver is more similar to the invalid waiver in *Celgene Corp.* The provisions of the Saiber Waiver are general. They do not adequately describe the parties' individual, independent, or divergent interests in this matter, nor do they provide any substantive descriptions of how Saiber's representation poses actual or may give rise to potential conflicts of interest. The Saiber Waiver does not provide adequate descriptions of the risks that Defendants' waiver of such conflicts poses. Nor does it include specific or adequate information about reasonably available alternatives to Saiber's representation of both Lincoln and Defendants. In sum, the Saiber Waiver's general provisions do not allow Defendants to make a knowledgeable and informed decision about the substance or nature of what they are waiving.

The second *Grand Jury* condition prohibits a third-party payer from in any way directing, regulating, or interfering with the lawyer's professional judgment. 200 N.J. at 495-96. Defendants present their respective declarations as evidence that the fee arrangement here has not interfered with their lawyers' independent judgment. [D.E. 102 at 23-24; D.E. 102-15; and D.E. 102-16]. Both of Defendants' declarations attest that they voluntarily and intelligently entered into waiver agreements for concurrent representation with Lincoln. [*See* D.E. 102-15, Rubinstein Decl. ¶¶3-6, 10; D.E. 102-16, Arbit Decl. ¶¶3-6, 10]. The declarations also state that Defense Counsel has kept them updated on the case and that they have had an "active role in [their] defense." [D.E. 102-15, Rubinstein Decl. ¶ 9; D.E. 102-16, Arbit Decl. ¶ 9].

But this does not establish that Lincoln has not directed, regulated, or interfered with Defense Counsel's professional judgment. Rather, the objective evidence indicates that Lincoln's interests have commandeered, or at least directed with primacy, Defense Counsel's approach to its defense of Defendants, as demonstrated by email communications between the parties in late 2022 and early 2023, where Defendants' response was wholly focused on Lincoln's interests. [*See* D.E. 92-5 at 2]. Additionally, in communications between the parties in January 2024, Defense Counsel emphasized Defendants and Lincoln "are willing to participate in this settlement discussion solely in an effort to compromise," and that "Dr. Arbit, Mr. Rubinstein and Lincoln are not willing to settle anywhere in the vicinity of the range you have proposed." [D.E. 92-6 at 2-3]. The record makes clear that Lincoln is directing, regulating, and interfering with Defense Counsel's professional judgment in its representation of Defendants, and thus, the second *Grand Jury* condition is not satisfied.

The third *Grand Jury* condition requires that no current attorney-client relationship exist between the attorney and the third-party payer. 200 N.J. at 496. Here, Defense Counsel admitted

in a hearing before the Court on March 27, 2024, that it "represents the two parties-in-suit as well as Lincoln," and that it is "advising all of them and representing all of them to the extent they have interests specifically in this case." [D.E. 92-9 at 70:4-7]. In addition to this, the Banner Witcoff Waivers confirm an attorney-client relationship exists between Banner Witcoff and Lincoln. Similarly, the Saiber Waiver makes clear that an attorney-client relationship currently exists between Saiber and Lincoln. Thus, the third condition in *Grand Jury* is not satisfied, because an attorney-client relationship exists between Defense Counsel and Lincoln at the same time that an attorney-client relationship exists between Defense Counsel and Defendants.

The fourth *Grand Jury* condition prohibits the lawyer from communicating with the third-party payer about the substance of the representation. 200 N.J. at 496. Communications between the parties show that Defense Counsel has continuously and regularly informed and kept Lincoln up to date about the substance of its representation of Defendants. [D.E. 92-6 at 2 ("Lincoln, Dr. Arbit and Mr. Rubenstein are willing to participate in this settlement discussion solely in an effort to compromise"); D.E. 92-6 at 3 ("Dr. Arbit, Mr. Rubenstein and Lincoln are not willing to settle anywhere in the vicinity of the range you have proposed")]. Indeed, a business representative from Lincoln was present and participated in a settlement conference in this action. [*See* D.E. 127 at 46:3-48:6]. Therefore, Defendants cannot demonstrate this condition is satisfied, either.

The fifth condition requires the third-party payer to "process and pay all such invoices within the regular course of its business, consistent with manner, speed and frequency it pays its own counsel." *Grand Jury*, 200 N.J. at 496. The Court has no evidence that definitively demonstrates that Lincoln processes and pays the invoices for Defendants' representation within

the regular course of its business in a way that is consistent with how it pays its own counsel, but it has no evidence to the contrary, either. The fifth condition is neutral.

Sixth, and finally, "[o]nce a third-party payer commits to pay for the representation of another, the third-party payer shall not be relieved of its continuing obligations to pay without leave of court brought on by prior written notice to the lawyer and the client*." Grand Jury*, 200 N.J. at 496*. The third-party payer has the burden of demonstrating that its obligation to pay for the representation should end. *Id.* Respecting the sixth condition, the indemnity clause in the Assignment Agreement executed between Lincoln and Defendants provides that "[t]he liability under this indemnity shall in no case exceed $250,000." [D.E. 92-2 at 5]. This would permit Lincoln to stop paying Defendants' legal fees as soon as the fees surpass the $250,000 threshold. Under this arrangement, Lincoln would not have to seek leave of court to be relieved of its obligation to pay Defendants' attorneys' fees as required by *Grand Jury*, and so, the sixth condition is not satisfied.

In sum, while there is no evidence about whether condition five is satisfied, *Grand Jury* provides that "a lawyer may represent a client but accept payment, directly or indirectly, from a third party provided *each* of the six conditions is satisfied." 200 N.J. at 495 (emphases added). Here, the parties' fee arrangement does not satisfy *Grand Jury*'s first requirement, because Defense Counsel has not fully obtained informed consent that validly waives the conflicts of interest posed by Saiber's representation. Further, conditions two, three, four, and six are not met. Consequently, Lincoln's payment of Defendants' attorneys' fees violates N.J.R.P.C. 1.8(f), and Defense Counsel may be disqualified from representing Defendants.

Defendants argue that they and Lincoln are all "co-clients" that "have agreed to sharing of litigation costs for their joint counsel;" that "RPC 1.8(f) and RPC 5.4(c) do not bar joint

23

clients from sharing fees;" and that *Grand Jury* does not apply to the joint-representation context. [D.E. 102 at 21-23]. However, this mischaracterizes the relationship between Defendants and Lincoln. While Courts have historically permitted joint clients to share responsibility for attorneys' fees, the key difference here is that in this specific action, Lincoln is not a co-defendant or a party at all. Rather, while Lincoln may have a strong interest in some future, hypothetical patent infringement action brought by Plaintiff if he succeeds in consolidating ownership of the '823 patent, for now, in this action, Lincoln is merely a third-party payer under N.J.R.P.C. 1.8(f) and *Grand Jury*. Furthermore, as explained, there is strong evidence that Lincoln is controlling the litigation; that Lincoln's indemnification of Defendants has impermissibly interfered with Defense Counsel's professional judgment; and that this has constrained Defense Counsel's ability to provide undivided loyalty to Defendants.

For these same reasons, it is not true that an application of *Grand Jury* to the specific facts of this case would lead to absurd results in the joint representation context, as Defendants maintain. [D.E. 102 at 29]. More specifically, finding that Lincoln's role as a third-party payer violates 1.8(f) and *Grand Jury* under the specific circumstances of this case will not mean that "any joint representation would require absolutely no cost sharing among co-clients," or that "parties who wish to share litigation costs would each be forced to retain separate lawyers." [*Id.*].[10] Defendants' reliance on *Perez v. PetSmart, Inc.*, No. 10-5399, 2011 WL 4026910, at *5

---

[10] The Court received and reviewed Defendants' December 11, 2024 sur-reply letter, which was filed without leave of Court. [*See* D.E. 177; L. Civ. R. 7.2]. In that letter, Defendants asserted discovery of "new evidence highly relevant to [Plaintiff's] pending motion to disqualify" that "confirms the Motion should be denied." [D.E. 177 at 1]. Defendants explain that during Plaintiff's deposition, Plaintiff "testified that he paid the legal fees for his sons, nonparties Nir and Alon Harish, who were deposed in this case," and who were represented by Plaintiff's Counsel during their depositions. [*Id.*]. Defendants argue that this demonstrates Plaintiff's motion to disqualify would lead to absurd results, because, by Plaintiff's own logic, Plaintiff himself is a third-party payer of Plaintiff's Counsel's fees in violation of N.J.R.P.C. 1.8(f). Even if the Court had granted Defendants leave to file a sur-reply, this argument is without merit. Rule 7.1.1(a) applies to all *parties* and requires the filing of a statement containing information regarding any person or entity *that is not a party* and is providing funding for some or all of the attorneys' fees and expenses for the litigation. The New Jersey Rules of Professional Conduct analyzed by the New Jersey Supreme Court in *Grand Jury*, 1.7(a)(2), 1.8(f) and 5.4(c), are concerned with conflicts arising out of such third-party funding

(E.D.N.Y. Sept. 12, 2011), is misplaced. In *PetSmart*, the court declined to disqualify counsel for the "joint representation" of employees in a state court case and of the employer in a federal court case because "there [was] no evidence that joint representation has interfered with counsel's professional judgement," or "that this compensation arrangement has done so." The situation here is different. *Id.* In this case, there *is* evidence that Defense Counsel's concurrent representation of Lincoln takes priority over their representation of Defendants, and that Lincoln's interests supersede Defendants' interests. Consequently, the concurrent representation creates an actual conflict insofar as it interferes with Defense Counsel's representation of and professional judgment with respect to Defendants.

Defendants also rely on *MaxLite, Inc. v. ATG Elecs., Inc*., No. 23-1719, 2024 WL 1526749 (3d Cir. Apr. 9, 2024), to support their assertion that "*Grand Jury* does not apply to joint representation when appropriate waivers of conflict are signed by all parties." [D.E. 102 at 28]. But this interpretation of the holding in *MaxLite* is incorrect. In *MaxLite*, the Third Circuit was asked to certify the question of whether *Grand Jury*'s sixth condition, which prevents a third-party payer from ceasing its contribution to legal fees without leave of court, applies "when a client and the purported third-party payer are jointly represented by counsel, assuming appropriate waivers of conflict are signed by all parties." 2024 WL 1526749, at *3. The Third Circuit declined to certify this question, because the District Court already established that

---

relationships and otherwise. Here, Plaintiff is a party to this matter and, by definition, cannot be a third-party payer of his own attorneys' fees in the way that Lincoln, a non-party to this action, is funding Defendants' litigation by paying Defense Counsel. Plaintiff's payment of counsel fees for non-party witnesses in this action, who are also his sons, cannot render Plaintiff a third-party litigation funder within the meaning of *Grand Jury*. Moreover, Defendants identify no indicia of any conflict of interest created by that payment arrangement. Indeed, that payment arrangement is a far cry from non-party Lincoln's payment of Defendants' litigation costs pursuant to written agreements that permit Lincoln to commandeer that defense for its benefit and that deprives Defendants of the undivided loyalty of Defense Counsel. In sum, Defendants' unauthorized sur-reply does not demonstrate how an application of *Grand Jury* to the facts of this matter leads to absurd results. To the contrary, their argument on this point strains credulity.

*Grand Jury* invalidated the third-party payer's joint representation, as it failed to satisfy three of the six *Grand Jury* conditions. *Id.* at *4. The Third Circuit emphasized in *MaxLite* that "[a]ll the requirements [in *Grand Jury*] were meant to ensure that the third-party payer does not influence the course of the litigation or breach the confidentiality of the attorney-client relationship," making *MaxLite* especially relevant here, because Lincoln has influenced decisions during the course of this litigation. *Id.* at *3.

### E.   Defense Counsel's Violation of 1.8(f) and *Grand Jury* Warrants Disqualification

While an attorney may be disqualified for violating a New Jersey Rule of Professional Conduct, disqualification is "a drastic measure which courts should hesitate to impose except when absolutely necessary." *Alexander*, 822 F. Supp. at 1114 (internal quotations omitted); *see also Alvarez v. Am. Lafrance, LLC*, No. 15-8446, 2017 WL 2709562, at *2 (D.N.J. June 23, 2017) ("[D]isqualification is a harsh remedy which must be used sparingly."). Ultimately, "[d]isqualification is never automatic." *High 5 Games,* 2018 WL 2278103, at *5 (citing *Miller*, 624 F.2d at 1201). "[T]he court should disqualify an attorney only when it determines, on the facts of the particular case, that disqualification is an appropriate means of enforcing the applicable disciplinary rule." *Miller,* 624 F.2d at 1201; *see also In re Boy Scouts of Am.*, 35 F. 4th 149, 160 (3d Cir. 2022) ("Even when an ethical conflict exists (or is assumed to exist), a court may conclude based on the facts before it that disqualification is not an appropriate remedy.").

Furthermore, when presented with a motion to disqualify counsel, the Court must balance the hardships one party will experience if his lawyer is disqualified against the potential hardships to the adversary if that lawyer is allowed to proceed. *Cendant Corp.*, 124 F. Supp. 2d at 249. "A conflict can be waived through lengthy inaction." *High 5 Games,* 2018 WL 2278103,

at *4 (citing *Alexander*, 822 F. Supp. at 1114). This is because in many instances, "disqualification is more disruptive than helpful even though an attorney may not have satisfied his or her professional obligations." *Jorjani v. N.J. Inst. of Tech.*, No. 18-11693, 2023 WL 2535318, at *2 (D.N.J. Mar. 16, 2023) (quoting *Boy Scouts*, 35 F.4th at 160) (citation and internal quotation marks omitted). Thus, in determining whether the facts warrant disqualification, courts should consider: "(1) prejudice to the non-moving party; (2) prejudice to the moving party; (3) the cost—in terms of time and money—to retain new counsel; (4) the complexity of the issues in the case and the time it would take for new counsel to acquaint themselves with the facts and issues; and (5) which party, if either, was responsible for creating the conflict." *See Wyeth v. Abbott Laboratories,* 692 F. Supp. 2d 453, 459 (D.N.J. 2010) (citing *Carlyle Towers,* 944 F. Supp. at 348).

Defendants argue the motion to disqualify should be denied because it is untimely. [D.E. 102 at 15]. Plaintiff filed his motion to disqualify counsel on April 12, 2024, and Plaintiff was aware that Lincoln was a client of Defense Counsel at the same time they were representing Defendants at least by June 2021. [D.E. 102-7]. Still, Plaintiff's knowledge of the nature and extent of the conflict of interest that triggered N.J.R.P.C. 1.8(f) concerns—particularly the fact that Lincoln was paying Defense Counsel's fees on behalf of Defendants—was not confirmed until around October or November 2023. [*See* D.E. 102-8 at 63:24-25, 64:1-2].[11] Plaintiff's motion to disqualify is not untimely. *See High 5 Games,* 2018 WL 2278103, at *4 (declining to disqualify counsel, explaining the conflict was waived through lengthy inaction because it was apparent four years ago). Timeliness is therefore not a bar to disqualification here.

---

[11] Because of motion practice after Plaintiff's filed his complaint, the Court did not enter a Scheduling Order and begin discovery until November 14, 2023. [*See* D.E. 8, 40, 47, 51, 55-57, 72, and 75].

Turning to the facts the Court must consider when determining whether disqualification is warranted, the time required for new counsel to familiarize themselves with the three years of litigation history in this case is not a sufficiently significant bar to disqualification—particularly in light of the parties' inability or unwillingness to compromise nearly any dispute that has arisen so far in this action, regardless of its significance, which has necessitated a churn of motion practice and dispute resolution. Likewise, the complexity of the issues in this case hardly weighs against disqualification. This action involves a claim for correction of inventorship. While it involves a patent, it is primarily about inventorship, not an action that seeks to establish, invalidate, or prove infringement of the patent itself. Further, Defendants and Lincoln, not Plaintiff, are responsible for creating the conflict of interest. Therefore, balancing the hardships under the totality of the circumstances, the severity of the conflict here is greater than the potential for hardship or prejudice to Defendants and warrants disqualification of Defense Counsel.[12]

## III.    CONCLUSION AND ORDER

**WHEREAS**, for the foregoing reasons and good cause shown,

**IT IS** on this 31st day of January 2025,

**ORDERED** that Plaintiff's motion to disqualify at D.E. 92 is **GRANTED**.

/s/ *André M Espinosa*
ANDRÉ M. ESPINOSA
United States Magistrate Judge

---

[12] Defense Counsel requests this Court award Defendants attorneys' fees under 28 U.S.C. § 1927, because Plaintiff's "attempts to disqualify [Defense Counsel] have been meritless, brought in bad faith, and have unreasonably and vexatiously multiplied these proceedings." [D.E. 102 at 32]. The Court concludes that Plaintiff's motion to disqualify has not "(1) multiplied proceedings; (2) in an unreasonable and vexatious manner; (3) thereby increasing the cost of the proceedings," nor did it "(4) do[] so in bad faith or by intentional misconduct." *In re Prosser*, 777 F. 3d 154, 162 (3d Cir. 2015) (citing *In re Prudential Ins. Co. Am. Sales Practice Litigation Agent Actions*, 278 F. 3d 175, 188 (3d Cir. 2002)). As is evident from this Court granting Plaintiff's motion to disqualify, the Court finds that Plaintiff brought a good faith argument for disqualification of counsel that was not meritless, and Defendants' request for attorneys' fees is denied.